ARK.]                                                    1041

Velda Rose Motel, Inc. *v.* Mrs. Everett Eason

5-4105                                            411 S. W. 2d 502

Opinion delivered February 20, 1967

1. APPEAL & ERROR—AMENDMENT OF PLEADINGS TO CONFORM TO
   PROOF—DISCRETION OF TRIAL COURT, ABUSE OF.—Under the facts
   and circumstances, there was no abuse of trial court's discretion
   in permitting plaintiff's pleadings to be amended to conform to
   the proof where no motion for continuance was made by de-
   fendant and no objecton made during trial to testimony re-
   lating to Parkinson's disease.
2. APPEAL & ERROR—RULING ON EVIDENCE—REVIEW.—Appellant failed
   to demonstrate prejudicial error occurred where trial court al-
   legedly permitted only a portion of physician's testimony re-
   lating to Parkinson's disease to be read to the jury by the
   court reporter after appellant's counsel withdrew his request

Appeal from Pulaski Circuit Court, *Tom Gentry*,
Judge; affirmed.

*Fulk, Wood, Lovett, Parham & Mayes*, for appel-
lant.

*Howell, Price & Worsham*, for appellee.

Carleton Harris, Chief Justice. On July 30, 1965,
Mrs. Everett Eason, appellee herein, instituted suit
against Velda Rose Motel, Incorporated, appellant here-
in, for the sum of $75,000.00 damages, alleging that, as
a result of appellant's negligence and carelessness, she
had received a severe sprain of the cervical spine, sprain
of the lumbar spine, and bruises and contusions over
and about her entire body. A general denial was filed
and the case proceeded to trial. At the conclusion of the
testimony, the jury retired, and returned a verdict,
signed by nine members of the jury, in the amount of
$50,000.00. From the judgment so entered, appellant
brings this appeal. Pertinent background facts devel-
oped by the testimony are as follows:

On the evening of June 10, 1965, appellee, wife of a
State Policeman, was attending the annual banquet of

the Arkansas Peace Officers' Association, which was being held at the Velda Rose Motel in Hot Springs. During dinner, a large panel, seven feet tall and three feet wide, fell and struck Mrs. Eason on the head. According to Mrs. Eason's testimony, the panel, after striking her on the head, "bounced off" and came back down, striking her shoulders. After the meal, she, together with her husband, left the meeting, and went to their home. After a sleepless night, Mrs. Eason consulted Dr. John Hundley, a Little Rock orthopedic physician, and X-rays were taken. A neck brace was prepared for appellee to wear, and she was sent to the hospital, where she was placed in traction, and received medication. After eleven days in the hospital, she returned home, still with her neck in traction. The brace, at time of trial, was being used at night, for one or two hours in the afternoon, and anytime that she rode in an automobile traveling over fifty miles per hour. On July 23, 1965, Norflex, a muscle relaxant, was prescribed, and appellee used this for approximately two weeks (the drug was also administered intravenously). On August 5 (this date being six days after her suit was filed), she noticed a breaking-out on the lower part of her stomach, and upper part of the legs, "welts, big red welts and streaks, some six, seven inches long, and approximately one-quarter of an inch wide.* * *" She testified that the itching was very bad, and within an hour her entire body, from her knees to her neck, was covered in welts. The family physician was called, and he diagnosed it as a drug reaction, and "gave me a shot to knock me out, because I was almost to the point of hysteria. I was in such an itching, burning condition, and he gave me three different medicines, pills to take that he said would help the condition. That was on Saturday night. Sunday I continued and he told me to quit taking these Norflex tablets because he felt sure that was what was causing it. * * * On Monday I broke out some more in other spots and by Monday the places that I had broken out Saturday night had turned blood red and looked like blood would start coming from the pores of the skin." She then testified that the red places were hemorrhag-

ing. Mrs. Eason described the home treatment that was then taken, but it became necessary to again send her to the hospital. There, she was treated by an allergist, the "breaking out" having increased until it was on her face, ears, eyes, and mouth. After five days and nights in the hospital, she was dismissed by this specialist, and within a few more days, the skin eruptions ceased. After the drug reaction and hospitalization, Mrs. Eason developed a tremor, and loss of sensation, in her right hand, which grew progressively worse. This tremor was evident during her testimony at the trial, and she testified that she was no longer able to perform prior activities.[1]

During the medical testimony, appellee's doctor expressed the opinion that Mrs. Eason was suffering from Parkinson's disease, and this bore a causal relation to the trauma. It is this evidence that gives rise to appellant's complaints, and its points for reversal are predicated upon the court's actions pursuant to this testimony.[2] Appellant contends that the verdict is in an amount far in excess of the proven damage, and that this verdict occurred because of two rulings by the court that were highly prejudicial to appellant. We will discuss these contentions in the order listed.

It is first asserted that the court committed error by "peremptorily permitting appellee to amend her complaint in the midst of trial to inject a new element of damage—Parkinsonism, supposedly caused by the drug in the face of appellant's claim of surprise." Let it be stated that we will not detail the medical evidence

---

[1] Appellee testified that she had made most of her own clothing, did her own cooking, and "canned and preserved." She had also won the state championship (for women) in pistol shooting several times, but the tremor in her right hand prevented participation in these activities.

[2] The queston of whether there was negligence on the part of appellant, which was a proximate cause of the injuries sustained, is not argued.

offered by appellee relative to the cervical spine sprain,[3] nor the other conditions testified to by Dr. Hundley, relative to his findings as an orthopedic physician and surgeon, nor do we deem it necessary to describe the suffering detailed by appellee. The contention that the judgment is excessive is based on the allegation that the testimony relative to Parkinson's disease was the cause of the large amount awarded; accordingly, if this evidence was proper, and there was no abuse of discretion in allowing the complaint to be amended, the point is without merit.

Dr. Hundley, after testifying in detail as to the spine sprain and neck injury, stated that appellee was afflicted with Parkinson's disease, and that, in his opinion, there was a causal relationship between her trauma and this disease; that she was considerably disabled, would continue to need treatment, and that such a condition continually grows worse, "Well, all Parkinson's goes on and on." On cross-examination, the doctor stated that the rash was caused from the Norflex drug. He said that it first occurred to him that she might have Parkinson's disease when he observed the tremor, and likewise on cross-examination he stated that he sent her to Dr. William King Jordan, a neurologist. It was the opinion of Dr. Hundley that the Parkinson's disease was probably occasioned by the taking of the Norflex drug. At the conclusion of the doctor's testimony, counsel for appellee moved that the complaint be amended to conform to the proof. Counsel for appellant objected to the motion, stating, "it came as a complete and absolute surprise to the defendant." This brings us to appellant's first argument, the contention being that the court abused its discretion in permitting the complaint to be amended.

---

[3]Dr. Hundley distinguished between strain and sprain as follows: "Strain is simply stretching of the muscles, ligamentous structures. A sprain is associated with tearing of muscles, tissues, or fascia, tissues or joints or ligaments of the joints and capsules, ligaments about the joints."

It is admitted that normally a court has the right to permit pleadings to be amended, even while the trial is in progress, but appellant asserts that the court should have recognized that the defending party, in this instance, could not protect itself immediately, and the granting of the motion was therefore an abuse of discretion, and constituted error. We do not agree. If counsel for appellant was surprised, he should have moved for a continuance. This was not done. Not only that, but it would seem that, if totally unaware of any possible Parkinson's disease, appellant would have objected when evidence, relative to this ailment, was first introduced. However, though Mrs. Eason, her husband, and Dr. Hundley, directed quite a bit of testimony to this condition, no objection was ever raised. Instead, appellant's counsel proceeded to cross examine these witnesses on this point,[4] and subsequently, interrogated his own witness, Dr. Horace Murphy, about this disease. It is difficult to understand why appellant was surprised, for Dr. Murphy, an orthopedic surgeon, while testifying on behalf of appellant, stated that he had previously suggested in a report submitted to appellant's counsel, that *"a neurological examination should be carried out to see if this is an anxiety reaction or could be some neurological disease. This is in my report[5]* (emphasis supplied) and I simply did not really know what the reason for the trembling of the arm was. * * * Well, Parkinson isn't basically from my meager knowledge of the condition. That is, it is a condition which takes place as a result of an area in the brain of a basal ganglion, special area which has to do with controlling certain motions in the arm. Now, if, for example, arteriosclerosis or changes of this type take place here then the controlled mechanism isn't present and the motions that the patient develop, fine tremors, and this is basically what Parkinson does, a lot of work on Laser Beam and ac-

---

[4] It was during cross-examination that Dr. Hundley testified that the Parkinson's disease was likely a result of Norflex intoxication.

[5] Dr. Murphy's report was dated January 5, 1966, which was approximately twenty-five days before the trial commenced.

tually treating these things certain types of beams into the brain but again it is a highly specialized area and many things resemble Parkinson that aren't Parkinson; brain tumors, other things can give you various types of symptoms. *That's why I wanted, from my standpoint, a neurological consultation* (emphasis supplied)." At any rate, we have frequently held that pleadings can be amended, in the sound discretion of the court, and, under the facts and circumstances herein, we find no abuse of that discretion, particularly when there was no motion for a continuance, and no objection to the testimony relating to Parkinsonism was ever made.

Appellant next asserts:

"It was prejudicial error to permit only a portion of Dr. Hundley's testimony relating to Parkinson's disease to be read to jury during closing argument. Counsel and court had agreed that all of such testimony would be read but the court terminated the reading of this part of the testimony after reporter read such as developed on direct examination."

We cannot agree that error has been demonstrated. The official court reporter stated that she did not follow the practice of taking closing arguments of counsel, unless previously requested to do so, and that she had left the courtroom. The bailiff sought her out and asked her to bring her stenographic notes. She was then requested to find Dr. Hundley's testimony on direct-examination concerning Parkinson's disease. Both counsel then agreed that the testimony of Hundley as to whether there was a causal relationship between the trauma and Parkinson's disease could be read, and accordingly read a portion of the evidence. Counsel for appellant asked that she find his cross-examination on this point. The reporter stated that she read a portion; that counsel said, "Go on, go on further," and she was searching through the testimony when:

"* * * Mr. Wood [again] stated: 'May I state I

asked specifically, for the record, that the Court request the Court reporter to read from the record, wherein I was cross-examining Dr. Hundley with reference to Parkinson's disease, and the Court says no.' Mr. Howell stated: 'With all respect, may I request the Court to agree with the request.' Mr, Wood stated: 'No, don't do it.' The Court stated: 'Read the whole testimony of Dr. Hundley.' Mr. Howell stated: 'I want to read the part Mr. Wood wants read.' Whereupon the Court stated: 'Continue, Mr. Howell.' Thereupon, according to my notes Mr. Howell made his closing argument."

At once, it is evident that this record is confusing, but it appears that when counsel for appellee asked the Court to agree with the request counsel for appellant said: "*No, don't do it* (emphasis supplied)," *i. e.,* he was withdrawing the request that the testimony be read.

Counsel for appellant then made the following statement for the record:

"I want to dictate. Defendant renews its objection to the court permitting a portion of Dr. Hundley's testimony to be read to the jury and not having sufficient patience to permit the reporter to read, locate and read all of Dr. Hundley's testimony, including that on cross-examination."

The court thereupon stated:

"Put this in the record. Let the record show while the reporter was out of the room, the Court instructed the jury that they were the sole judges of the testimony and that statements of attorneys were not evidence and they heard the witness' testimony and that they would make the decision as to what the witnesses testified; that thereafter both Mr. — counsel for plaintiff and counsel for defendant agreed to reading the testimony which was read."

We try cases on the record, and certainly, under this record, we cannot say that error was committed.

Affirmed.